**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:

MICHAEL T. SHEPARDSON,

    Debtor

_____/

CASE NO: 6:19-bk-04573-KSJ
CHAPTER 7

**WELLS FARGO BANK, N.A.'S**
**MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

**(Re: 1635 Elizabeths Walk, Winter Park, Florida 32789)**

---

**NOTICE OF OPPORTUNITY TO OBJECT AND REQUEST FOR HEARING**

**Pursuant to Local Rule 2002-4, the Court will consider this the relief requested in this paper without further notice or hearing unless a party in interest files a response within 21 days from the date set forth on the attached proof of service, plus an additional three days for service if any party was served by U.S. Mail.**

**If you object to the relief requested in this paper, you must file a response with the Clerk of the Court at 400 W. Washington Street, Suite 5100, Orlando, FL 32801, and serve a copy on the movant's attorney, Patrick Hruby, Esq., at Brock & Scott, PLLC, 2001 Northwest 64th Street, Suite 130 Fort Lauderdale, FL 33309, and any other appropriate persons within the time allowed. If you file and serve a response within the time permitted, the Court will either schedule and notify you of a hearing or consider the response and grant or deny the relief requested without a hearing.**

**If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, will proceed to consider the paper without further notice or hearing, and may grant the relief requested.**

---

Wells Fargo Bank, N.A., its successors and assigns ("Secured Creditor"), by and through its undersigned counsel, files this *Motion for Relief from the Automatic Stay*, and in support thereof states as follows:

1.    The Court has jurisdiction over this matter pursuant to 11 U.S.C. § 362, Fed. R. Bankr. P. 4001(a) and the various other applicable provisions of the United States Bankruptcy Code, Federal

Rules of Bankruptcy Procedure and the laws of the United States of America.

2.      On July 15, 2019, MICHAEL T. SHEPARDSON ("Debtor" as used herein will refer to a single or multiple Debtors), filed a voluntary petition pursuant to Chapter 7 of the Bankruptcy Code.

3.      Secured Creditor holds a security interest in the Debtor's real property located at 1635 Elizabeths Walk, Winter Park, Florida 32789 (the "Property"), by virtue of a Mortgage which is recorded in book 9367 page 2559 and instrument number 20070492451 recorded the Public Records of Orange County, Florida (the "Mortgage").  The Mortgage secures a Note in the amount of $350,000.00 (the "Note").  A copy of the Mortgage, together with the Note and Assignments, as applicable, is attached hereto as **Exhibit A**.

4.      The Mortgage gives Secured Creditor a lien on the Property, which is legally described as:

**Lot 45, WINDSONG - ELIZABETH'S WALK, according to the plat thereof as recorded in Plat Book 43, Page 81, of the Public Records of Orange County, Florida**

5.      The Property has not been claimed exempt by the Debtor. The Property has not been abandoned by the Trustee.

6.      According to the *Chapter 7 Individual Debtor's Statement of Intention*, the Debtor is surrendering the Property.  "See Declaration as to Surrendered Property attached hereto as **Exhibit B**." As of August 26, 2019, the Debtor is indebted to Secured Creditor in the amount of $307,663.15 principal balance, with interest accruing, plus other fees and costs advanced by Secured Creditor pursuant to the loan documents. Payments pursuant to the Mortgage have been in default since November 13, 2018.

7.      According to the Debtor's Schedule A, the value of the Property is $750,00.00.  The Property is subject to a first mortgage in favor of Valley National Bank, Successor to

USAmeribank in the amount of $2,610,000.00. Therefore, there is no equity in the Property for unsecured creditors.

8.    Secured Creditor's interest in the Property is being significantly jeopardized by the Debtor's failure to make regular mortgage payments while Secured Creditor is prohibited from pursuing its lawful remedies to protect such interest.  Thus, the Debtor has failed to adequately protect the interest of Secured Creditor.

9.    In addition, because this is a Chapter 7 case, the Property is not necessary to an effective reorganization.

10.    Therefore, Secured Creditor maintains that cause exists pursuant to 11 U.S.C. § 362(d)(1) and/or § 362(d)(2) for the automatic stay to be lifted.

11.    Pursuant to 11 U.S.C. § 362(e), Secured Creditor requests that, in the event a hearing is necessary, said hearing be held within thirty (30) days.

12.    Secured Creditor has incurred attorneys' fees of $750.00 and costs of $181.00 as a result of the necessity of filing this Motion.  Said fees and costs are recoverable as part of the debt pursuant to the loan documents but shall not be a personal liability of the Debtor.

13.    Secured Creditor requests that any communication by Secured Creditor in connection with proceeding against the property including, but not limited to, notices required by state law and communications to offer and provide information with regard to a potential forbearance agreement, loan modification, refinance agreement, loss mitigation agreement or other loan workout, may be sent directly to the Debtor.

14.    Because Debtor has indicated an intention to surrender the Property, Secured Creditor requests that the Court waive the fourteen (14) day stay set forth in Bankruptcy Rule 4001(a)(3), so that Secured Creditor can pursue its *in rem* remedies without further delay.

**WHEREFORE**, Secured Creditor, and its successors and assigns, respectfully requests that the automatic stay be lifted so that Secured Creditor may be permitted to protect its security interest in the Property outside the bankruptcy forum; that in the event a hearing is necessary, said hearing be held within thirty (30) days; that Secured Creditor's attorneys' fees and costs incurred in filing this Motion be recoverable as part of the debt pursuant to the loan documents under the remedies available therein but shall not be a personal liability of the Debtor; that Secured Creditor be permitted to contact the Debtor for the reasons stated; that the fourteen (14) day stay set forth in Bankruptcy Rule 4001(a)(3) be waived; and such other and further relief as the Court may deem just and proper.

BROCK & SCOTT, PLLC
Attorney for Secured Creditor
2001 Northwest 64th Street, Suite 130
Fort Lauderdale, FL 33309
Phone: 813-342-2200
Fax: 954-618-6954
Floridabklegal@Brockandscott.com

/s/ Patrick Hruby

_____
PATRICK HRUBY, ESQUIRE
Florida Bar No. 0088657

**I HEREBY CERTIFY** that a true copy hereof has been served electronically or via U.S. mail, first-class postage prepaid, to:

The following persons were served by U.S. mail:

MICHAEL T. SHEPARDSON
2837 LAKE BALDWIN LANE, B302
ORLANDO, FL 32814-6970

<u>The following persons were served by e-mail:</u>

Amy Denton Harris
110 Madison Street, Suite 200
Tampa, FL 33602

Arvind Mahendru
5703 Red Bug Lake Road
Suite 284
Winter Springs, FL 32708

United States Trustee - ORL7/13
Office of the United States Trustee, George C Young Federal Building
400 West Washington Street, Suite 1100
Orlando, FL 32801

      this **9th** day of September 2019.

                      BROCK & SCOTT, PLLC
                      Attorney for Secured Creditor
                      2001 Northwest 64th Street, Suite 130
                      Fort Lauderdale, FL 33309
                      Phone: 813-342-2200
                      Fax: 954-618-6954
                      Floridabklegal@Brockandscott.com

                      /s/ Patrick Hruby

                      _____
                      PATRICK HRUBY, ESQUIRE
                      Florida Bar No. 0088657

Return To:
FASSETT, ANTHONY & TAYLOR, P.A.
1325 WEST COLONIAL DRIVE
ORLANDO, FL 32804 2667-21A
JM

INSTR 20070492451
OR BK 09367 PG 2559 PGS=6
MARTHA O. HAYNIE, COMPTROLLER
ORANGE COUNTY, FL
07/25/2007  03:47:03 PM
MTG DOC TAX 1,225.00
INTANG TAX 700.00
REC FEE 52.50

This Document Prepared By:
Wells Fargo Bank, N.A.
ANGELA HILDRETH
DOCUMENT PREPARATION
ONE HOME CAMPUS
DES MOINES, IOWA 50328
888-934-3669

State of Florida's Documentary stamp Tax required by law in
the amount of $_____ has been paid to the
Clerk of the Circuit Court (or the County Comptroller, if
applicable) for the County of **ORANGE**, State of Florida.

After Recording Return To:
Wells Fargo Bank, N.A.
Attn: Document Mgt.
P.O. Box 31557 MAC B6955-015
Billings, MT 59107-9900

————State of Florida————   **————Space Above This Line For Recording Data ————**
REFERENCE#: ▮▮▮▮▮▮▮               Account number:

# MORTGAGE
### (With Future Advance Clause)
### (Short Form)

1. **DATE AND PARTIES.** The date of this Short Form Mortgage ("Security Instrument") is <u>**JUNE 29, 2007**</u> and
the parties, their addresses and tax identification numbers, if required, are as follows:

   MORTGAGOR:   **MICHAEL SHEPARDSON, a single man**

   Whose address is: **2900 SANDWELL DR, WINTER PARK, FLORIDA 32792**

   LENDER: **Wells Fargo Bank, N.A., 101 North Phillips Avenue, Sioux Falls, SD 57104**

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged,
and to secure the Secured Debt (defined below) and Mortgagor's performance under this Security Instrument,
Mortgagor, grants, bargains, conveys to Lender the following described property:
   APN/PARCEL:  **17-22-30-9371-00-450**
   **SEE ATTACHED EXHIBIT**

   The property is located in **ORANGE** County at **1635 ELIZABETHS WALK** ,
                      (County)             (Address)
   **WINTER PARK,**           Florida     **32789**
   (City)                              (Zip Code)
   Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and
   riparian rights, wells, ditches, and water stock and all existing and future improvements, structures, fixtures, and
   replacements that may now, or at any time in the future, be part of the real estate described above (all referred to
   as "Property").

1/5

Documents Processed 06-28-2007, 12:55:02



3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $350,000.00. This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
   A. Debt incurred under the terms of the promissory note, revolving line of credit, contract, guaranty or other evidence of debt dated **JUNE 29, 2007**, together with all amendments, extensions, modifications or renewals. The maturity date of the Secured Debt is **JUNE 29, 2047**.
   B. All future advances from Lender to Mortgagor under such evidence of debt, whether obligatory or discretionary. All future advances are secured as if made on the date of this Security Instrument. Nothing in this Security Agreement shall constitute a commitment to make additional or future loans or advances which exceed the amount shown in Section 3. Any such commitment must be agreed to in a separate writing.
   C. All sums advanced and expenses incurred by Lender for insuring, preserving, or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

5. **OTHER TERMS.** If checked, the following are applicable to this Security Instrument:

   [X] **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

   [N/A] **Construction Loan.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

   [N/A] **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures relates to the Property. This Security Instrument suffices as a financing statement and any carbon, photographic or other reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial Code.

   [N/A] **Additional Terms.   N/A**

FLMtg – short CDP V.1 (10/2002)

Documents Processed 06-28-2007, 12:55:02

2/5



6.  **RIDERS.** If checked, the following are applicable to this Security Instrument. The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument.

| N/A | Third Party Rider |
| N/A | Leasehold Rider |
| N/A | Other:  **N/A** |

7.  **MASTER FORM MORTGAGE.** By the delivery and execution of this Security Instrument, Mortgagor agrees that all provisions and sections of the Master Form Mortgage ("Master Form"), inclusive, dated **April 10, 2001**, and recorded on **May 08, 2001** as Instrument Number **2001-0199012** in Book **6253** at Page **3907-3912** of the Circuit Court in **ORANGE** County, State of Florida, a copy of which was previously provided to Mortgagor by Lender, are hereby incorporated into, and shall govern, this Security Instrument. This Security Instrument does not incorporate any provision in the Master Form Mortgage that references a certain Home Equity Closing Handbook, such Handbook no longer being in existence.

**SIGNATURES:**  By signing below, Mortgagor agrees to perform all covenants and duties as set forth in this Security Instrument.  Mortgagor also acknowledges receipt of a copy of this document and a copy of the provisions contained in the previously recorded Master Form Mortgage (the Mortgage-Bank/Customer Copy).

In witness whereof, the parties have signed this document on this _____ day of  **JUN 2 9 2007** , 20 _____ .

_____    **JUN 2 9 2007**

Mortgagor  **MICHAEL T SHEPARDSON**                                                Date

_____    _____

Mortgagor                                                                                        Date

_____    _____

Mortgagor                                                                                        Date

_____    _____

Mortgagor                                                                                        Date

_____    _____

Mortgagor                                                                                        Date

_____    _____

Mortgagor                                                                                        Date

_____    _____

Mortgagor                                                                                        Date

_____    _____

Mortgagor                                                                                        Date

FL Mtg – short CDP V.1 (10/2002)                                                           3/5

Documents Processed 06-28-2007, 12:55:02

_____    JUN 2 9 2007
Witness        LAURA MEDINA                                    Date

_____    JUN 2 9 2007
Witness        JANET MARINSHAW                                Date

FL Mtg. short CDR V.1 (10/2002)

Documents Processed 06-28-2007, 12:55:02



Page 4 of 6

For An Individual Acting In His/Her Own Right:

STATE OF FLORIDA,            County, ss: _Orange_____

     The foregoing instrument was acknowledged before me, on this ___ day of
___JUN 2 9 2007____, 20___ by
_Michael T. Shepardson_____
who is personally known to me or who has produced _drivers license_____
as identification.

Janet Taylor-Marinshaw
Commission # DD577612
Expires September 3, 2010
Bonded Troy Fain - Insurance, Inc  800-385-7019

Print Name: _____

Title or Rank: _____

Serial Number, if any: _____

My Commission expires: _____

FL Mtg – short CDP V.1 (10/2002)

Documents Processed 06-28-2007, 12:55:02

Book9367/Page2563                        Page 5 of 6

# Exhibit "A"

**Legal Description for File No.: 2667-21A**

**Lot 45, WINDSONG - ELIZABETH'S WALK, according to the plat thereof as recorded in Plat Book 43, Page 81, of the Public Records of Orange County, Florida**

Wells Fargo Bank, N.A.

**AGREEMENT DATE:   06-29-2007**
**ACCOUNT #:**
**REFERENCE #:**

---

## EquityLine with FlexAbility® Agreement
## and Disclosure Statement (the "Agreement")

**PREP - 308**

**JUL 1 9 2007**

---

**Borrower Name:**
MICHAEL T SHEPARDSON

**Property Address:**
1635 ELIZABETHS WALK, WINTER PARK, FLORIDA 32789

**Mailing Address for Billing Purposes (if different):**
N/A

**Credit Line Limit:**
350,000.00

## SECTION 1:  MY ACCOUNT AGREEMENT

In this Agreement, the words, "I," "me," "my," and "Borrower" (which also means "we," "us," "our," and "Borrowers," if more than one customer signs below) refer to each person who signs this Agreement. The words "you," "your," "Lender," and "the Bank" refer to Wells Fargo Bank, N.A. and any successor or assign or subsequent holder of this Agreement. This Agreement governs my EquityLine with FlexAbility® Account (the "Account") with the Bank. If more than one person signs this Agreement, we are jointly and individually bound by its terms. We are separately liable to the Bank for the entire amount owed on the Account. We are each liable as a principal and not merely as a guarantor, even if one or more of us does not use the Account.

## SECTION 2:  SECURITY INTEREST

I am giving the Bank a deed of trust, mortgage or other security instrument including all modifications, addenda and amendments thereto (the "Security Instrument"), signed the same date as this Agreement. The Security Instrument gives you a security interest in the property located at the address shown above (the "Property").

## SECTION 3:  MY EQUITYLINE WITH FLEXABILITY

My Account is a revolving account. My credit limit is shown above and will be displayed on each of my billing statements. During the Draw Period (described below), my available credit will be my credit limit minus the sum of all unpaid Advances posted to my Account. During the Draw Period, as I repay the principal balance I owe on my Account, my available credit will be replenished. I agree not to request an Advance that would cause my balance to exceed my credit limit. If at any time the balance of my Account exceeds my credit limit, I agree to

ELFAGRMT MULTI-STATE HCWF#101--30 (5/11/07)

Documents Processed 06-28-2007, 12:55:02



immediately repay the amount that exceeds my credit limit.

I may apply for an increase in my credit limit, and if I do so I agree to pay any application, appraisal and other fees, including increased costs for title insurance, as the Bank may require. If the Bank approves my application and increases my credit limit, I will provide and maintain such additional hazard insurance (including flood insurance, if necessary) and sign any additional documents as the Bank may require. All such increased credit amounts will be governed by the terms and conditions of this Agreement and will be secured by the Security Instrument.

The Bank may from time to time in its sole discretion, approve additional credit for me under the terms of this Agreement. I will receive written notice from the Bank of any such offer to increase my credit limit. I may accept such offer of increased credit by my use of those additional funds and by signing any additional documents the Bank may require. All such increased credit amounts will be governed by the terms and conditions of this Agreement and will be secured by the Security Instrument.

## SECTION 4: MY ACCOUNT DURING THE DRAW PERIOD

### DRAW PERIOD
My Account has a Draw Period of 10 years from the date of this Agreement during which I may request Advances. At the end of the Draw Period, I may request that the Bank renew the Draw Period for an additional 10 years. The Bank may, at its option, approve my request to extend the Draw Period. I may not obtain Advances after the Draw Period ends.

When the Draw Period ends, the outstanding unpaid Line of Credit Advances will convert to a Final Fixed Rate Advance as detailed below in Section 5, MY ACCOUNT DURING THE REPAYMENT PERIOD.

### ADVANCES DURING THE DRAW PERIOD
There are 2 types of Advances on my Account:

- Line of Credit Advances
- Fixed Rate Advances

The Bank must honor my request for Line of Credit Advances and Fixed Rate Advances (collectively, "Advances") as long as I am in compliance with all terms of this Agreement, including all modifications, addenda and amendments to it, and the Security Instrument.

As I use my Account, my available credit will be my credit limit minus the sum of all unpaid Advances. As I repay the principal balance I owe on my Account, my available credit will be replenished. I will not request an Advance that would cause the balance in my Account to exceed my credit limit, or which would violate the terms of this Agreement or any law. If I do exceed my credit limit, I agree to immediately repay the amount that exceeds my credit limit.

I understand that the Bank may refuse to allow any Advance if the Advance does not comply with every requirement of this Agreement. The Bank may choose at its sole discretion to make an Advance that does not comply. The Bank may allow any Advances in any sequence convenient to the Bank.

The Bank is authorized to make an Advance from my Account when it receives a request given by any person who has signed this Agreement. If there are conflicting demands made by any of us who signed this Agreement, the Bank has the option to refuse to make any Advance that has not been requested by all of us together. The Bank will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when the Bank acts upon such instructions believing them to be genuine.

### LINE OF CREDIT ADVANCES
Each Line of Credit Advance I request will be in the amount of $300 or greater.

**LINE OF CREDIT ADVANCE METHODS**
While my Account is not in default, closed, or suspended, I may obtain a Line of Credit Advance by:
- Requesting a Line of Credit Advance in person at any Bank branch
- Requesting a Line of Credit Advance by phone
- Transferring funds by using Wells Fargo Online®
- In other ways the Bank authorizes from time to time
- Obtaining a cash withdrawal or transferring funds by using my Wells Fargo ATM Card or Wells Fargo ATM & Check Card, if offered by the Bank and I select such service
- Writing an Advance request check or draft which the Bank has provided to me
- Using my home equity access credit card, if offered by the Bank and I select such service

**LINE OF CREDIT ADVANCES PERIODIC FINANCE CHARGES**
Finance charges begin to accrue on Line of Credit Advances immediately when funds are advanced. The periodic FINANCE CHARGE for a billing cycle is the sum of the periodic FINANCE CHARGE for each day in the billing cycle. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for Line of Credit Advances (including current transactions) each day. To determine the daily balance, take the Line of Credit Advances balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement), add any new Line of Credit Advances, and subtract any payments or credits that apply to the repayment of Line of Credit Advances. The result is the daily balance.

The Daily Periodic Rate for Line of Credit Advances is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Margin, the initial Daily Periodic Rate, and the initial ANNUAL PERCENTAGE RATE, are each disclosed below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

The Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE on my Line of Credit Advances will be adjusted the day after an Index change is published, using the new Index value. Therefore, the Daily Periodic Rate for Line of Credit Advances may change (increase or decrease) as often as once each day based on changes in the Index. I understand that any increase may cause me to make larger monthly payments.

**LIFETIME RATE CAP FOR LINE OF CREDIT ADVANCES**
The Daily Periodic Rate for Line of Credit Advances will never exceed 0.049315% (corresponding **ANNUAL PERCENTAGE RATE** of 18.00%). This is the Lifetime Rate Cap for Line of Credit Advances.

**LIFETIME RATE FLOOR FOR LINE OF CREDIT ADVANCES**
The Daily Periodic Rate for Line of Credit Advances will never fall below 0.011616% (corresponding **ANNUAL PERCENTAGE RATE** of 4.240%). This is the Lifetime Rate Floor for Line of Credit Advances.

**MY INITIAL RATE FOR LINE OF CREDIT ADVANCES**
As discussed above, my Daily Periodic Rate is based on the value of the Index plus a Margin. The initial Index value that applies to my Account will be the value of the Index on the day I open my Account. The following disclosures are based on the value of the Index in effect on 06-28-2007. I understand that if I open my Account after this date, my actual Index value, Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE may be higher or lower than the rates disclosed below.

My Margin for Line of Credit Advances is equal to THREE HUNDRED SEVENTY-FIVE THOUSANDTHS OF ONE PERCENTAGE POINT (0.375%) (the "Margin"). As a result, unless the Lifetime Rate Cap for Line of Credit Advances or Lifetime Rate Floor for Line of Credit Advances require the Bank to apply a different rate to my Account, my initial Daily Periodic Rate is 0.023630% (corresponding **ANNUAL PERCENTAGE RATE** of 8.625%).

**LINE OF CREDIT ADVANCES MINIMUM MONTHLY PAYMENT**

Documents Processed 06-28-2007, 12:55:02

During the Draw Period, my Minimum Monthly Payment for Line of Credit Advances shall be equal to:

The sum of all accrued and unpaid periodic FINANCE CHARGES on Line of Credit Advances, plus credit insurance premiums, if any.

## FIXED RATE ADVANCES DURING THE DRAW PERIOD

I have the option to convert outstanding unpaid Line of Credit Advances to Fixed Rate Advances during the Draw Period based on credit limit availability. The minimum Fixed Rate Advance during the Draw Period is $10,000.

I may request up to 8 Fixed Rate Advances during the Draw Period. No more than 3 Fixed Rate Advances may be outstanding at any one time. At the time I request a Fixed Rate Advance, I may select the repayment term for that Fixed Rate Advance. The repayment term must be a period of whole years and in the range described below:

| Fixed Rate Advance Amount | Term Range |
|---|---|
| $10,000 - 19,999.99 | 5 to 15 years |
| $20,000 - 49,999.99 | 5 to 30 years |
| $50,000 and above | 7 to 30 years |

## FIXED RATE ADVANCE METHODS DURING THE DRAW PERIOD

While my Account is not in default, closed, or suspended, I may obtain a Fixed Rate Advance by:
* Requesting a Fixed Rate Advance in person at any Bank branch.
* Requesting a Fixed Rate Advance by phone.

## FIXED RATE ADVANCES PERIODIC FINANCE CHARGES DURING THE DRAW PERIOD

Fixed Rate Advances will accrue periodic FINANCE CHARGES beginning on the day that the Bank converts any Line of Credit Advances to a Fixed Rate Advance. I will be charged a periodic FINANCE CHARGE on all outstanding unpaid Fixed Rate Advances each day at a fixed Daily Periodic Rate. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for the Fixed Rate Advance (including current transactions) each day. To determine the daily balance for the Fixed Rate Advance, take the Fixed Rate Advance balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement), and subtract any payments or credits that apply to the repayment of the Fixed Rate Advance. The result is the daily balance.

The Daily Periodic Rate for Fixed Rate Advances is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Bank will use the value of the Index in effect on the last business day preceding the day the Bank receives my request for a Fixed Rate Advance. The Margin for Fixed Rate Advances is eight percentage point(s) (8.0%). The Bank may, in its sole discretion, apply a lower Margin. The corresponding ANNUAL PERCENTAGE RATE for Fixed Rate Advances will never be more than the Lifetime Rate Cap for Fixed Rate Advances shown below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

## LIFETIME RATE CAP FOR FIXED RATE ADVANCES DURING THE DRAW PERIOD

The Daily Periodic Rate for Fixed Rate Advances will not exceed 0.0493% (corresponding **ANNUAL PERCENTAGE RATE** of 18.000%). This is the Lifetime Rate Cap for Fixed Rate Advances.

## FIXED RATE ADVANCE AT ACCOUNT OPENING

I have requested an initial Fixed Rate Advance at Account opening in the amount of $350,000.00, and for a 10 year term. My Daily Periodic Rate on this initial Fixed Rate Advance is 0.023288% (corresponding **ANNUAL PERCENTAGE RATE** of 8.500%).

## FIXED RATE ADVANCES MINIMUM MONTHLY PAYMENT DURING THE DRAW PERIOD

During the Draw and Repayment Periods, my Minimum Monthly Payment for each Fixed Rate Advance will be equal to the amount of principal plus periodic FINANCE CHARGE sufficient to repay the Fixed Rate Advance within its applicable term in substantially equal, fully amortizing monthly payments at the applicable



corresponding ANNUAL PERCENTAGE RATE. This assumes that all payments will be made on their due dates, which will be the same as the due dates for my Line of Credit Advances Minimum Monthly Payment described above. If my payments are not consistently made when due, the Fixed Rate Advance Minimum Monthly Payment may not fully repay the Fixed Rate Advance over its term and my final payment may be higher. During the Draw Period, my available credit for new Line of Credit Advances will be replenished by the amount of principal I repay on my Fixed Rate Advances.

## MY TOTAL PAYMENT DUE DURING THE DRAW PERIOD
I will receive monthly billing statements from the Bank. I must pay at least the amount of the Total Payment Due by the Date Due, as shown on each monthly billing statement.

The "Total Payment Due" during the Draw Period consists of my Line of Credit Advances Minimum Monthly Payment plus my Fixed Rate Advances Minimum Monthly Payment(s) together with all past due amounts and overlimit amounts and all other charges due.

## SECTION 5:  MY ACCOUNT DURING THE REPAYMENT PERIOD

### REPAYMENT PERIOD
I understand that I may not receive new Advances after the Draw Period ends. At that time, I will begin the Repayment Period, which will continue until the Maturity Date described below, but in no event more than 30 years.

### REPAYMENT OF OUTSTANDING FIXED RATE ADVANCES
During the Repayment Period, I will continue to make any Fixed Rate Advance Minimum Monthly Payments that were in effect at the end of the Draw Period. If my payments are not consistently made when due, the Fixed Rate Advance Minimum Monthly Payment may not fully repay the Fixed Rate Advance over its term and my final payment may be higher.

### REPAYMENT OF FINAL FIXED RATE ADVANCE
At the end of the Draw Period, the outstanding unpaid Line of Credit Advances balance will be converted into a final Fixed Rate Advance (the "Final Fixed Rate Advance"). The Final Fixed Rate Advance will have a term of 15 years if my total unpaid Line of Credit Advances balance is less than $20,000, or 30 years if my total unpaid Line of Credit Advances balance is $20,000 or more (unless I request a shorter term).

The Final Fixed Rate Advance Minimum Monthly Payment will be the greater of $100 or an amount sufficient to repay the Final Fixed Rate Advance balance by the end of the scheduled term in substantially equal, fully amortizing monthly payments of principal and periodic FINANCE CHARGE at the applicable corresponding ANNUAL PERCENTAGE RATE. If my payments are not consistently made when due, the Final Fixed Rate Advance Minimum Monthly Payment may not fully repay the Final Fixed Rate Advance over its term and my final payment for the Final Fixed Rate Advance may be higher. The Bank will notify me in advance of any changes to my Total Payment Due as a result of the Final Fixed Rate Advance Minimum Monthly Payment.

### PERIODIC FINANCE CHARGE ON FINAL FIXED RATE ADVANCE BALANCE
Periodic FINANCE CHARGES on my Final Fixed Rate Advance balance will begin to accrue on the first day of the Repayment Period. I will be charged a periodic FINANCE CHARGE based on the unpaid Final Fixed Rate Advance balance at the end of each day at a fixed Daily Periodic Rate.

The Daily Periodic Rate for the Final Fixed Rate Advance is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Bank will use the Index value published on the last business day during the Draw Period. The Margin for the Final Fixed Rate Advance is eight percentage point(s) (8.0%). The Bank may, in its sole discretion, apply a lower Margin. The corresponding ANNUAL PERCENTAGE RATE on my Final Fixed Rate Advance will never be more than the Lifetime Rate Cap for Fixed Rate Advances shown below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

### LIFETIME RATE CAP FOR MY FINAL FIXED RATE ADVANCE

ELEAGRMT MULTI STATE HCWE#101-30 (5/11/07)                    5/14



The Daily Periodic Rate for my Final Fixed Rate Advance will not exceed 0.0493% (corresponding **ANNUAL PERCENTAGE RATE** of 18.000%). This is the Lifetime Rate Cap for my Final Fixed Rate Advance.

## MY TOTAL PAYMENT DUE DURING THE REPAYMENT PERIOD

I must pay at least the amount of the Total Payment Due by the Date Due, as shown on each monthly billing statement.

The "Total Payment Due" during the Repayment Period is the total of each Fixed Rate Advances Minimum Monthly Payment that is still due as the result of Fixed Rate Advances in effect on the day before the end of the Draw Period, plus the Final Fixed Rate Advance Minimum Monthly Payment as described above, together with all past due amounts and overlimit amounts and all other charges due.

## MATURITY DATE

The Maturity Date on my Account shall be the latest maturity date of any Fixed Rate Advance or the Final Fixed Rate Advance, but in no event more than 30 years from the end of the Draw Period. At that time, any remaining balance must be paid in full.

## SECTION 6:  AUTOMATIC PAYMENT DISCOUNT

The Automatic Payment Discount is not applicable to this Account.

## SECTION 7:  OTHER FINANCE CHARGES

In addition to paying periodic FINANCE CHARGES, as described in Sections 4 and 5 above, I also agree to pay the following additional fees, each of which is a **FINANCE CHARGE**:

N/A

## SECTION 8:  ADDITIONAL OTHER FINANCE CHARGES AND CLOSING COSTS

I agree to pay upon the opening of my Account the other finance charges and other charges that are enumerated and disclosed on the attached final HUD Settlement Statement which is integrated by reference into this Agreement.

## SECTION 9:  ADDITIONAL FEES, COSTS AND CHARGES

In addition to the FINANCE CHARGES and closing costs described above, I agree to pay the following non-refundable fees, costs and charges, which will be owed once charged to my Account.

## ANNUAL FEE

During each year of the Draw Period, whether or not I use the Account, a $75.00 non-refundable annual fee will be charged to my Account. This fee is waived the first year my Account is opened, and is billed beginning in the second and each succeeding year, during the Draw Period, on the anniversary date of this Agreement.

## LATE CHARGES

During the Draw Period, I will pay a late charge equal to the greater of five dollars ($5.00) or five percent (5%) of the Line of Credit Minimum Monthly Payment if my payment is more than 10 days past due.

During the Repayment Period, I will pay a late charge equal to the greater of five dollars ($5.00) or five percent (5%) of the sum of all Fixed Rate Advance Minimum Monthly Payments if my payment is more than 10 days past due.

## PREPAYMENT FEE

I agree to pay a prepayment fee of $500.00. This fee will be due and payable in full at any time within the first 3 years from the date of this Agreement if I close my Account (for any reason other than default due to non-



payment, casualty loss, refinance with you or your affiliate, or termination by the Bank). If my Account remains open (is not closed or suspended under Section 17 or 18 below) for more than 3 years from the date of this Agreement, no prepayment fee will be assessed. No tender of a prepayment of all amounts due under this Agreement shall be effective unless and until such prepayment is accompanied by the applicable prepayment fee.

### OTHER CHARGES
To the extent allowed by law, I agree to pay the following fees if I request or authorize these additional services:

  (a) **Fax Fee:** The Bank will charge a fax fee in the amount of ten dollars ($10.00) if I request or authorize others to request any document or letter to be transmitted by facsimile (fax) machine.
  (b) **Research Fee and Photocopy Fee:** The Bank will charge a research/photocopy fee in the amount of five dollars ($5.00) per photocopy if I request or authorize others to request that the Bank research my Account or provide photocopies of Account documents for any purpose other than a billing error inquiry.
  (c) **Reconveyance or Satisfaction Fee:** The Bank will charge reconveyance and satisfaction fees as allowed by applicable law.
  (d) **Stop Payment Fee:** The Bank will charge a stop payment fee in the amount of twenty-five dollars ($25.00) if I request or authorize others to request that the Bank stop payment on a draft I have used to request a Line of Credit Advance.
  (e) **Return Check Fee:** The Bank will charge a return check fee in the amount of twenty-five dollars ($25.00) if I make a payment with a check that is dishonored for any reason.
  (f) **Overlimit Fee:** The Bank will charge an overlimit fee in the amount of twenty-five dollars ($25.00) for each billing cycle in which I have exceeded my credit limit or have requested an Advance that would have caused me to exceed my credit limit.
  (g) **Return Advance Check Fee (insufficient funds):** The Bank will charge a return advance check fee in the amount of twenty-five dollars ($25.00) for each check or draft used to request a Line of Credit Advance that is returned unpaid (dishonored) by the Bank due to the requested Advance not meeting all requirements of this Agreement.

## SECTION 10: COLLECTION COSTS AND ATTORNEY'S FEES

If I am in default, I will pay the Bank's collection costs, attorney's fees and other expenses of enforcing the Bank's rights under this Agreement and the Security Instrument, unless prohibited by applicable law.

## SECTION 11: METHOD OF PAYMENT

Depending on my chosen method of payment, the Bank will do one of the following each monthly billing cycle, during both the Draw and Repayment Periods:

**Monthly Billing Statement:** Provide me with a monthly billing statement showing the Total Payment Due and the due date, and including a remittance portion that I must return with my monthly payment.

## SECTION 12: SCHEDULED PAYMENT DUE DATE

My monthly payment due date for my Total Payment Due is the 13TH day of each and every month during both the Draw and Repayment Periods.

## SECTION 13: MY PROMISE TO PAY

I promise to pay to the order of the Bank the total of all Advances which I receive or which I authorize to be made from my Account. I promise to pay the total of any FINANCE CHARGE, plus all amounts past due, overlimit amounts, and any late charges, fees, other charges and obligations charged to my Account under this Agreement or the Security Instrument. All payments made under this Agreement will be made in U.S. Dollars. I will not mail any cash payments to the Bank. I may not use Advance request checks to make payments on my Account.



The Bank may, at its discretion, withhold a portion of the available credit on my Account up to the amount of any payment due in order to assure that my check or other payment instrument is honored.

I will make payments at the Bank's address for receiving a payment, as indicated on my payment coupon and billing statement, unless another payment method is authorized by the Bank. Each non-electronic payment I make will be accompanied by the remittance portion of my billing statement.

I understand that payments I make by mail to the address indicated on my billing statement or payment coupon will be credited to my Account as of the date received (including Saturdays, Sundays, and holidays) if the Bank receives the payment prior to 5 p.m. local time for the payment address.

Payments I make from a qualified account ("Automatic Payments") pursuant to an Authorization for Automatic Transfer will be credited to my Account on the date received (including Saturdays, Sundays, and holidays).

Payments I make at a Bank branch and received prior to established cut-off times will be credited to my Account on the business day the payment is received by the Bank. For purposes of this rule, a business day includes any day other than Saturdays, Sundays, and Bank observed holidays. Payments made at a Bank branch received on a Saturday, Sunday, or Bank observed holiday or after established cut-off times will be credited as of the next business day.

Payments I make online, by ATM, by telephone, or by any other means the Bank may make available to me and received prior to established cut-off times will be credited to my Account on the business day the payment is received by the Bank. For purposes of this rule, a business day includes any day other than Saturdays, Sundays, and federal holidays. Payments made online, by ATM, by telephone, or by any other means the Bank may make available to me received on a Saturday, Sunday, or federal holiday or after established cut-off times will be credited as of the next business day.

I will not make payment or authorize others to make payment for me by means of a single aggregated payment, which includes payments for this Account and any other account(s), unless the payment is made in compliance with the Bank's requirements for multiple account payments.

The Bank may accept late payments, partial payments, post-dated checks, or any form of payment containing a restrictive endorsement, without losing any of the Bank's rights under this Agreement. The Bank's acceptance of checks or money orders labeled "payment in full," or words to that effect, will not constitute an accord and satisfaction nor a waiver of any rights the Bank has to receive full payment. If I intend to condition a payment, pay the Account in full with less than the total amount owed, or give payment instructions, I will clearly set out such intention, conditions and instructions in a separate letter accompanying my payment, and mail both to Wells Fargo Bank, N.A., P.O. Box 2993, Portland, OR 97208.

## SECTION 14: TAX DEDUCTIBILITY

I understand that I should consult a tax advisor regarding the deductibility of interest and charges under my Account.

## SECTION 15: REEVALUATION OF CREDIT QUALIFICATIONS AND CREDIT REPORTS

My signature on this Agreement authorizes the Bank to obtain credit information about me, including credit bureau reports, at any time. Such credit bureau reports may be requested or used in connection with (a) renewal or extension of this Agreement, (b) review of my Account, (c) taking any collection action, or (d) any other legitimate purposes associated with my Account. I agree to submit current financial information to the Bank upon the Bank's request. The Bank may reexamine and reevaluate my credit qualifications at any time. The Bank may report its experience with me and my Account to others, to the extent allowed by law.

## SECTION 16: PAYOFF BALANCE INFORMATION



The Bank will tell me the balance required on any given day to pay off my Account in full, if I so request. If such request is made on my behalf by an escrow holder, settlement agent or other third party on my behalf during the Draw Period, the Bank may immediately freeze my Account. I agree that the Bank's receipt of such a request from an escrow holder, settlement agent or other third party on my behalf will be considered to be a request by me to suspend credit privileges on my Account. While my Account is frozen, I cannot receive new Advances and the Bank will return unpaid any Advance request checks the Bank receives and will refuse to honor any other Advance request made on my Account. This payoff freeze will be lifted and my Account reopened if the request for payoff balance information is withdrawn, in which event the Bank may require written confirmation from the escrow holder, settlement agent or other third party on my behalf that the escrow or other settlement has been cancelled.

## SECTION 17: DEFAULT

I will be in default if (a) I fail to meet the repayment terms of this Agreement for any outstanding balance, or (b) there is fraud or material misrepresentation by me in connection with this Agreement, or (c) any action or inaction by me adversely affects the Bank's security in the Property, including without limitation, transfer of the Property without the Bank's consent, failure to maintain required insurance or pay required taxes, revocation or termination of any revocable trust that is an owner of the Property, or the death of any person who has signed this Agreement, or (d) I am an executive officer of the Bank and federal law governing credit extended by a bank to its executive officer, including without limitation Section 215.5(d)(4) of Federal Reserve Regulation O (12 CFR § 215.5(d)(4)), permits or requires immediate payment of my entire Account balance.

If I am in default, the Bank, subject to applicable law, may do any or all of the following: (a) close my Account immediately, without notice; (b) return unpaid any outstanding Advance request checks drawn on my Account and refuse to honor any other Advance request made on my Account; and (c) require immediate payment of the entire balance of my Account, and, if I fail to pay, exercise the Bank's rights under the Security Instrument, which may result in the loss of the Property. If I am in default, the method of determining the Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE will remain as described in this Agreement.

The Bank and I agree that notwithstanding any other provision of this Agreement or the Security Instrument, the Bank will have the right to terminate or suspend my Account to the extent permitted by applicable law.

## SECTION 18: CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT; REINSTATEMENT OF CREDIT

### CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT BY BORROWER

Any one Borrower can close the Account by paying in full and sending a signed letter to the Bank at the address indicated on my monthly billing statement requesting that the Account be closed. Any one Borrower may terminate the Advance feature, at any time during the Draw Period, by sending a signed letter to the Bank at the address indicated on my monthly billing statement requesting the termination of the Advance feature. To reactivate the Advance feature on the Account during the Draw Period, the Bank will require all Borrowers to sign a written request and mail to the address indicated on my monthly billing statement.

### CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT BY BANK

I will receive a written notice if the Bank suspends or freezes my Account or reduces my credit limit as required under applicable law. The notice will include the reason(s) for such action(s). Thereafter, if I wish to reinstate my Account or increase my credit limit, I agree to send a written request to the Bank at the address specified on my monthly billing statement, signed by all of the Borrowers, along with satisfactory evidence to the Bank that the reason(s) for suspension or reduction of my Account no longer exist(s). I also agree to provide the Bank promptly with any additional information necessary to support my request.

The Bank may suspend the use of my Account and temporarily prohibit future Advances during the Draw Period, or the Bank may reduce my credit limit, for any reason permitted by applicable law, including without

Documents Processed 06-28-2007, 12:55:02



limitation, (a) if the annualized Daily Periodic Rate equals or exceeds the Lifetime Rate Cap stated herein, (b) there is any material change in my financial circumstances that the Bank reasonably believes will make me unable to fulfill my repayment obligations under this Agreement, (c) the value of the Property declines significantly below its original appraised value, as determined by the Bank, (d) my failure to comply with any material obligation under this Agreement or the Security Instrument, (e) a regulatory authority has notified the Bank that continued Advances would constitute an unsafe and unsound business practice, (f) I am in default under Section 17 above, or (g) government action prevents the Bank from imposing the ANNUAL PERCENTAGE RATE provided for in this Agreement or impairs the Bank's security interest in the Property, such that the value of the security interest is less than 120 percent of the credit limit.

In the event of a suspension of my Account, the Bank is authorized to obtain such information as may be required by the Bank, including without limitation, credit reports and appraisals of the Property, to evaluate any request by me to reinstate the Account. To the extent permitted by applicable law, I agree to pay to the Bank the cost of obtaining such additional information.

If my Account is closed or suspended for any reason, the Bank may return unpaid any outstanding Advance request checks drawn on my Account and refuse to honor any other Advance request made on my Account. I will continue to be responsible for full payment of the balance of my Account as well as all other Account obligations, according to the terms of this Agreement.

## SECTION 19: FURTHER ASSURANCES

I agree that I will take any steps, including but not limited to, signing, filing or recording any documents, which are necessary or which the Bank deems appropriate, to be sure that my obligations to the Bank under this Agreement become and continue to be secured by the Security Instrument.

## SECTION 20: CHANGE IN RESIDENCE OR OWNERSHIP OF THE PROPERTY

I agree to notify the Bank immediately if (a) the Property is my primary residence and I cease to live in the Property as my primary residence, or (b) there is any change in the ownership of the Property. I agree that my Account shall be closed and that the entire outstanding balance of my Account shall be due and payable immediately on any sale or other transfer of the Property, unless prohibited by applicable law. In this regard, I understand that my Account is secured by a Security Instrument containing the following or a substantially similar provision:

Upon sale, transfer, hypothecation, assignment or encumbrance, whether voluntary, involuntary, or by operation of law, of all or any part of the Property or any interest therein, then at its sole option, the Bank may, by written notice to Trustor (or Grantor or Mortgagor), declare all obligations secured hereby immediately due and payable, except to the extent that such acceleration and in such particular circumstances where exercise of such a right by the Bank is prohibited by law.

## SECTION 21: CHANGE IN TERMS

To the extent allowed by law, I agree that the Bank may make certain changes to the terms of this Agreement at specified times or upon the occurrence of specified events. The Bank may make insignificant changes, such as changes in the address for payments, billing cycle dates, payment due dates, day of the month on which Index values are determined, Index or interest rate rounding rules, and balance computation method (if the change produces an insignificant difference in the interest or FINANCE CHARGE I am required to pay). The Bank may also make changes that will benefit me, such as additional options or a temporary reduction in rates or fees. In accordance with federal law, the Bank may also change the Index and Margin used to determine the ANNUAL PERCENTAGE RATE(S) that apply to my Line of Credit Advances and/or Fixed Rate Advances if the original Index is no longer available. The Bank may make any of the changes discussed above without my consent, unless applicable law provides otherwise. The Bank will give me any notice of change that is required by law. I may also agree to changes in writing.



## SECTION 22: WAIVERS

### BORROWER'S WAIVERS

I waive my rights to require the Bank to do certain things. Those things are: (a) to demand payment of amounts due (known as "presentment"); (b) to give notice that amounts due have not been paid (known as "notice of dishonor"); (c) to obtain an official certification of nonpayment (known as "protest"). Anyone else who agrees to keep the promises made in this Agreement, or who agrees to make payments to the Bank if I fail to keep my promises under this Agreement, or who signs this Agreement to transfer it to someone else, waives these rights. These persons are known as "guarantors, sureties and endorsers."

### BANK'S NON-WAIVER

The Bank may fail to make use of any of its rights under this Agreement or the Security Instrument or under applicable law on one or more occasions, or delay or partially exercise such rights, without waiving any of its rights or amending any of my obligations. The Bank may fail to make use of any of its rights or delay or partially exercise such rights against one party, without waiving any of its rights against any other party to this Agreement.

## SECTION 23: GOVERNING LAW; SEVERABILITY

All interest, fees and other amounts charged or accruing in connection with this Agreement which are considered "interest" within the meaning of Section 85 of the National Bank Act (12 USC § 85; 12 CFR 7.4001(a)) shall be governed by and interpreted under South Dakota law. In all other respects, this Agreement and all related documents, as well as the rights, remedies, and duties of the Bank and the Borrower(s), shall be governed and interpreted under federal law with respect to national banks and, to the extent not preempted by federal law, the laws of the state in which the Property is located.

If any provision of this Agreement or the Security Instrument is determined to be invalid or unenforceable by a court of competent jurisdiction, the rest of this Agreement will remain in full force and effect and enforceable according to its terms. All references in this Agreement to the singular shall include the plural and vice versa.

## SECTION 24: LOST OR STOLEN ADVANCE REQUEST CHECKS; BILLING ERRORS

### LOST OR STOLEN ADVANCE REQUEST CHECKS (WHERE AVAILABLE); BILLING ERRORS

I will immediately contact the Bank at the phone number on my monthly billing statement and confirm by letter if any of my Advance request checks are ever lost or stolen, if there are any errors in my monthly billing statement, or if I suspect any unauthorized use of my Account.

The Bank will not return to me my cancelled Advance request checks or other Advance request instruments after paying them. The Bank will make available photocopies of my Advance request checks and other Advance request instruments upon request. I will examine my Account statements promptly in order to identify any improper or unauthorized entries. In consideration for the Bank's payment of each Advance request check, I agree that even though I will not receive the original Advance request checks, all time periods under the Uniform Commercial Code (UCC) for examining my monthly billing statement and reporting improper entries, including the UCC's statutes of limitation with respect to forged, unauthorized, or missing signatures or endorsements, will begin from the time my Account statement is first sent or made available to me.

### UNAUTHORIZED TRANSACTIONS

I will notify the Bank if someone has transferred, or may transfer money from my Account without my permission, or if I suspect any fraudulent activity on my Account. I can call the Wells Fargo Phone Bank at the telephone number on my monthly billing statement, anytime, 24 hours a day, 7 days a week, or advise my local Bank branch office. I may also send written notice to the Bank at the address indicated on my billing statement.

### Billing Rights - Keep This Notice For Future Use

This notice contains important information about my rights and the Bank's responsibilities under the Fair Credit



Billing Act.

### Notify The Bank In Case Of Errors Or Questions About My Bill

If I think my billing statement is wrong, or if I need more information about a transaction on my billing statement, I will send a letter on a separate page to the Bank, as soon as possible, at the address listed on my billing statement. The Bank must hear from me no later than 60 days after the Bank sent me the first billing statement on which the suspected error or problem appears. I can telephone the Bank, but doing so will not preserve my rights.

In my letter, I will provide the Bank with the following information:

- My name, Account number and daytime phone number, and
- The dollar amount of the suspected error, and
- A description of the error and explanation, if possible, as to why I believe there is an error. If I need more information, I will describe the item I am not sure about.

If I have authorized the Bank to pay my minimum monthly payment automatically from my checking account at the Bank, I can stop the payment of any scheduled automatic payment if I believe a billing error has occurred. To stop the payment, my letter must reach the Bank at least three business days before the automatic payment is scheduled to occur.

### My Rights And The Bank's Responsibilities After Receipt Of My Written Notice

The Bank must acknowledge my letter within 30 days, unless the Bank has corrected the error by then. Within 90 days, the Bank must either correct the error or explain why the Bank believes the billing statement was correct.

After the Bank receives my letter, the Bank cannot try to collect any amount I question, or report me as delinquent. The Bank can continue to bill me for the amount I question, including finance charges, and the Bank can apply any unpaid amount against my credit limit. I do not have to pay any questioned amount while the Bank is researching my Account, but I am still obligated to pay the parts of my bill that are not in question.

If the Bank finds that a mistake was made on my billing statement, I will not have to pay any finance charges related to the questioned amount. If the Bank didn't make a mistake, I will have to pay finance charges, and I will have to make up any missed payments on the questioned amount. In either case, the Bank will send me a statement of the amount I owe and the date that payment is due.

If I fail to pay the amount that the Bank determines I owe, the Bank may report me as delinquent. However, if the Bank's explanation does not satisfy me and I write to the Bank within ten days telling the Bank that I still refuse to pay, the Bank must tell anyone the Bank reports me to that I have a question about my bill. And, the Bank must tell me the name of anyone the Bank reports me to. When the matter has been settled between the Bank and me, the Bank must tell anyone the Bank reports me to that the matter has been settled.

If the Bank does not follow the above rules, the Bank cannot collect the first $50 of the questioned amount, even if my billing statement was correct.

## SECTION 25: NOTICES

Unless applicable law requires a different method, any notice that must be given to me or to anyone else who signs, guarantees or endorses this Agreement may be given by mailing it to my address as set forth above in this Agreement, or to a different address if I have properly notified the Bank of that different address. Any notice that I may send to the Bank must be given by mailing it to the Bank at the address provided on my billing statement, unless the type of notice is more specifically addressed in this Agreement and a different address is provided herein.

If I contact you by phone, I acknowledge that telephone calls between me and the Bank or any of the Bank's affiliates may be monitored and recorded by the Bank or the Bank's affiliates to ensure that my inquireies are



handled promptly, courteously and accurately.

I agree that the Bank may contact me by telephone. I agree to accept calls from the Bank at any telephone number that I provide to the Bank.

I agree to accept calls from the Bank or the Bank's designated representatives which begin with a verbal statement or taped message identifying the call as a business call from the Bank. I acknowledge and understand that some of the telephone calls between me and the Bank may be monitored and recorded to ensure that the Bank handles these calls courteously and accurately.

**SECTION 26:**

**N/A**

**SECTION 27: ADDENDA**

I agree to the following attached addenda, modifications or amendments:

N/A

**SECTION 28: STATE DISCLOSURES**

STATE OF FLORIDA DOCUMENTARY STAMP TAXES IN THE AMOUNT REQUIRED BY LAW WILL BE PAID UPON THE RECORDING OF THE MORTGAGE SECURING THIS NOTE.

THIS AGREEMENT, THE SECURITY INSTRUMENT AND THE CLOSING DOCUMENTS EXECUTED HEREWITH CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT OF THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THIS AGREEMENT.

<strong>NOTICE TO THE BORROWER</strong>

**DO NOT SIGN THIS AGREEMENT IF IT CONTAINS BLANK SPACES. ALL SPACES SHOULD BE COMPLETED BEFORE THIS AGREEMENT IS SIGNED.   READ THIS AGREEMENT BEFORE SIGNING IT.**

**ACKNOWLEDGMENT**

**I have received, read and retained a copy of this EquityLine with FlexAbility® Agreement and Disclosure Statement (the "Agreement"), the Security Instrument, the Agreement to Provide Insurance, and the HUD Settlement Statement provided to me at the closing, all of which I agree to by signing this Agreement. The HUD Settlement Statement is incorporated into and made a part of this Agreement. I acknowledge receipt of the EquityLine with FlexAbility® Important Terms disclosure and the home equity brochure when I applied for this Account. In addition, I hereby agree that the terms of this Agreement replace the terms of any prior oral or written agreements between the Bank and me about this Account, including, for example, any and all commitment letters and pre-approval letters between the Bank and me about this Account.**

_____   (Seal)   6-29-07
BORROWER                                             DATE SIGNED
**MICHAEL T SHEPARDSON**

_____ (Seal)  JUN 2 9 2007
BORROWER                                                    DATE SIGNED

_____ (Seal)  _____
BORROWER                                                    DATE SIGNED

_____ (Seal)  _____
BORROWER                                                    DATE SIGNED

_____ (Seal)  _____
BORROWER                                                    DATE SIGNED

_____ (Seal)  _____
BORROWER                                                    DATE SIGNED

_____ (Seal)  _____
BORROWER                                                    DATE SIGNED

_____ (Seal)  _____
BORROWER                                                    DATE SIGNED

ELEAGRMT-MULTISTATE HCWE#101-20 (5/11/07)

Exhibit "B"
## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                                    CASE NO: 19-04573
                                                          CHAPTER 7
MICHAEL T. SHEPARDSON,

       Debtor

_____/

## <u>DECLARATION AS TO SURRENDERED PROPERTY</u>

    I, Patrick Hruby, declare under penalty of perjury as follows:

    1.    I am an attorney for Brock & Scott, PLLC, the law firm that filed the Motion for Relief from Stay on behalf of Wells Fargo Bank, N.A. (the "Movant".)

    2.    This Declaration is being filed in support of the Motion for Relief from Stay filed in this action by Movant, its Successors and/or Assigns.

    3.    I have personally reviewed the Debtor's Voluntary Petition filed in this case. According to the Debtor's Statement of Intentions, the Debtor(s) intends to surrender the real property located at:  1635 Elizabeths Walk, Winter Park, Florida 32789, further described as:

        **Lot 45, WINDSONG - ELIZABETH'S WALK, according to the plat thereof as recorded in Plat Book 43, Page 81, of the Public Records of Orange County, Florida**

    4.    As of the date of this declaration, I have examined the CM/ ECF docket for this case and have found no entries evidencing a contrary intent on the part of the Debtor.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 4th day of September  2019.

/s/ Patrick Hruby
PATRICK HRUBY, ESQUIRE
Florida Bar No. 0088657

19-F01746